# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ARTHUR PHILLIPS  *

    Plaintiff  *

    v.  *  Civil Action Case No. DKC-11-302

VALERIE MURRAY, *et al.*  *

    Defendants  *

\*\*\*

## MEMORANDUM OPINION

Pending are Defendants' Motions to Dismiss or for Summary Judgment. ECF No. 25 and 26. Plaintiff opposes the motions. ECF No. 28 and 33. The court finds a hearing in this case unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

### Background

Plaintiff alleges that in October, 2008, he injured his knee while getting off the top bunk in a cell at the Montgomery County Correctional facility. ECF No. 1 at p. 2. He describes feeling a sharp rip inside of his left knee and experiencing immediate swelling. He was taken to Shady Grove Hospital and the doctor who examined him scheduled him for an MRI. In December, 2008, Plaintiff was told that the MRI revealed he had torn an old graft in the knee and that surgery would be required to repair it.

On February 2, 2009, Plaintiff was transferred to North Branch Correctional Institution (NBCI) where he was interviewed by Valerie Murray, L.P.N. for initial intake. Plaintiff states he provided Nurse Murray with his copy of the MRI report for his left knee, told her he would need to be assigned to a bottom bunk and that he would need to be scheduled for knee surgery. ECF No. 1 at p. 3. In addition, Plaintiff told Nurse Murray he needed to continue receiving steroid

injections for "painful keloids" on his face.[1]  Id.  Nurse Murray told Plaintiff that all requests had to be approved by Dr. Collin Ottey.

On February 25, 2009, Plaintiff put in a sick call slip requesting a sleeve for his knee to help with the pain until he saw the doctor.  In addition, Plaintiff explained that he needed to see the doctor because it felt as though the bones in his left knee were rubbing together.  Plaintiff was seen by Dr. Ottey in March, 2009 for the first time.  Plaintiff told Dr. Ottey his knee was painful and often swollen and that the keloids on his face were painful.  He showed Dr. Ottey a copy of the MRI report and Dr. Ottey assured him he would receive knee surgery but that "things needed to be ironed out first."  ECF No. 1 at p. 4.  Plaintiff claims Dr. Ottey also stated he would refer him for steroid injections for the keloids on his face and prescribed 600 mg of Motrin, but did not order bottom bunk status or a knee sleeve.  Dr. Ottey told Plaintiff to be patient as surgery could take a while.

On June 5, 2009, Plaintiff complained again that his knee was swollen.  When he was seen by Dr. Ottey he was told he would receive the surgery to his left knee, but that the budget was a problem and only life-threatening conditions were being treated surgically.  Plaintiff had not received the promised steroid injections for the keloids, but was again told he would be placed on a list to receive them.

On October 25, 2009, Plaintiff complained that his knee and keloids were not being treated.  ECF No. 1 at p. 4.  Plaintiff explained to Dr. Ottey that the Motrin never helped, that he was in constant pain, and that his knee continued to give out.  Plaintiff asked about the status of his surgery, and approval for assignment to a bottom bunk.  Dr. Ottey prescribed a stronger medication to Plaintiff, made another copy of the MRI report, and promised to "get on top of it."

---

[1] The injections had been provided to Plaintiff at the Montgomery County facility.

*Id*. at p. 5. Plaintiff states he was again told he was on a list to receive treatment for his keloids and that Dr. Ottey advised him to check back in two weeks about the surgery.

In November, 2009, Plaintiff was seen by Physician's Assistant Steve Fleer who told him that "probably nothing would be done for [his] knee cause (sic) my injury sometimes reoccurs so they are reluctant to waste money on surgery." ECF No. 1 at p. 5. On December 12, 2009, Plaintiff contacted Barbara Newlon, contract operations manager, complaining that nothing was being done to address any of his medical problems. Plaintiff sent Ms. Newlon a copy of the MRI report indicating his need for surgery. *Id*.

On January 26, 2010, Plaintiff was seen by Dr. Ottey who told him he would be receiving an x-ray of his left knee and that he would be receiving steroid injections for the keloids. When Plaintiff asked why his knee was going to be x-rayed when an x-ray would not show the ligament damage apparent in the MRI, Dr. Ottey told him that the x-ray was the beginning of the process to have his surgery approved. ECF No. 1 at p. 6.

On February 1, 2010, Plaintiff received a letter from Barbara Newlon stating that she had reviewed his file and noted that Plaintiff had been scheduled for an x-ray. She advised Plaintiff to utilize the sick call process to access medical services. On March 26, 2010, Plaintiff put in a sick call slip because nothing was being done concerning his knee pain or his face. Plaintiff was seen by Physician's Assistant Lisa Schindler on April 4, 2010. Physician's Assistant Schindler requested assignment to a bottom bunk for Plaintiff, increased his medication, referred him to physical therapy, provided a knee sleeve, and referred him for an evaluation of keloids. *Id*. Plaintiff also made a request to be seen by an outside orthopedic doctor.

On June 1, 2010, Plaintiff submitted another sick call slip requesting an increase in pain medication or for something stronger. Approximately two weeks later Plaintiff submitted

3

another sick call slip asking why his medication had been stopped and when he was going to be seen for his facial keloids. Plaintiff was seen by Dr. Majid who told him if the pain medication was not working, he should not be on it. No other medication was provided for Plaintiff. ECF No. 1 at p. 7. Plaintiff began physical therapy in July of 2010. He states he continued with therapy for three months, but stopped because his knee wasn't getting any better.

In response to an Administrative Remedy complaint (ARP) Plaintiff filed, Plaintiff met with an ARP "medical coordinator." The meeting took place on July 28, 2010. Plaintiff was given a slip of paper indicating he should be assigned to a bottom bunk which was dated April 7, 2010. When Plaintiff asked why the date was not current and why there was a delay in giving him the assignment, he was told there was no explanation. Plaintiff was also told someone else would be in touch with him regarding his knee surgery, but he claims no one ever contacted him. *Id*. at pp. 7 – 8.

On August 29, 2010, Plaintiff claims he was provided a knee sleeve by Nurse Africa. He states he was given paperwork with the sleeve which was dated April 7, 2010. Plaintiff states he signed his name on the form, but indicated the actual date next to his name. In November Plaintiff was placed back on medication to address his pain, but was still not given an answer concerning whether his surgery was approved. Plaintiff claims he was again told he would receive the steroid injections to his face, but that at present there was no one on staff who could do them. *Id*. at p. 8.

Correctional Defendants assert entitlement to summary judgment because there are no allegations implicating them in any of the decisions made regarding Plaintiff's medical care. ECF No. 25. In addition, they assert they have no authority to order medical employees to perform any particular treatment or direct their decision making authority in any manner. *Id*. at

Ex. A. To the extent correctional Defendants responded to Plaintiff's complaints regarding medical service, they claim they helped facilitate visits with medical staff and did not interfere with treatment prescribed. *Id*.

Medical Defendants claim Plaintiff's knee is being treated through use of conservative measures and that surgery was requested for his knee but was not approved by Wexford Health Services, Inc. (Wexford).[2] ECF No. 26. Defendants confirm that the MRI study done on Plaintiff's knee showed "a severe injury to the anterior cruciate ligament (ACL) graft with significant tearing throughout the length of the graft." *Id*. at Ex. C, pp. 1 – 2.[3] They agree that upon his transfer to MRDCC on February 2, 2009, Nurse Murray performed an intake history and physical on Plaintiff and requested that Plaintiff be assigned to a lower bunk due to his knee injury. Defendants assert, however, that ultimately the decision whether to assign Plaintiff to a bottom bunk lies with correctional staff. They also note that Plaintiff was also provided Motrin for his knee pain. *Id*. at pp. 3 – 7.

After his transfer to NBCI, Plaintiff was provided with an elastic Ace wrap to use on his knee after he requested a knee brace, but said he did not want it if it would interfere with him being able to work. Plaintiff was also given Motrin for treatment of the knee pain. Although Plaintiff complained that his knee pain had worsened, Defendant Dr. Ottey asserts that the examination of his knee did not reveal any excess fluid around the knee or looseness of the ligaments in the knee: thus, Plaintiff was given Motrin and would be followed up in the Chronic Care Clinic. *Id*. at Ex. A, p. 4; Ex. C pp. 8 – 12; 138 – 142.

---

[2] Wexford is the utilization review contractor for the State of Maryland. Wexford is charged with the responsibility of reviewing and approving all requests for consultations, referrals, medical devices, tests, and surgeries. ECF No. 26 at p. 7.
[3] The report describes the tear as so large that it is effectively a full tear. *Id*.

Over the course of the following year Plaintiff continued to complain of knee pain, that his knee gives out on him from time to time, and that he was not getting enough relief from the pain medications prescribed. Examinations of Plaintiff's knee revealed he maintained a full range of motion with no swelling, but the knee was tender with moderate pain. In light of his continued complaints, Dr. Ottey ordered an x-ray of Plaintiff's knee and added a non-steroidal anti-inflammatory medication known as indomethacin to his pain medication. The x-ray was performed on February 2, 2010, and revealed reduced joint space with osteoarthritic changes to Plaintiff's left knee. Plaintiff was advised to follow-up with medical in six weeks. *Id*. at Ex. A, pp. 5 – 6; Ex. C, pp. 23 – 26.

When Plaintiff reported to medical complaining of knee pain on March 7, 2010, he indicated to P. A. Flury that his knee was painful and unstable when he was playing basketball. At this time the results of Plaintiff's x-ray were shared with him, his pain medications were continued, and he was referred for evaluation by a physician. *Id*. at Ex. C, pp. 27 – 29. Three days later Plaintiff was seen by Dr. Majid Arnaout. Plaintiff told Dr. Arnaout that his pain level was at an 8 out of 10 and indicated his whole knee hurt. Dr. Arnaout noted that Plaintiff was laughing during their conversation and his examination of Plaintiff's knee was normal. In an attempt to better address his pain, Dr. Arnaout prescribed Neurontin, an anti-epileptic medication used to treat chronic pain. *Id*. at Ex. A, p. 7; Ex. C, pp. 30 – 31. When examination of Plaintiff's knee on March 24, 2010, revealed tenderness, instability, and moderate pain with motion, an orthopedic consultation with Dr. Huber Mickel was written by P.A. Schindler. The referral also requested physical therapy. *Id*. at Ex. A, p. 7. Another request of physical therapy (PT) was made on April 7, 2010, by P.A. Schindler when Plaintiff again requested treatment for his knee.

P.A. Schindler also made a request for Plaintiff to be assigned to a bottom bunk and ordered a knee sleeve[4] for Plaintiff. *Id*. at Ex. A, p. 9; Ex. C, pp. 38 – 44.

Plaintiff began PT on May 27, 2010, to increase the strength in his knee and decrease the pain. Defendants claim the PT continued through August 31, 2010, and that Plaintiff's pain level improved along with his gait. *Id*. at Ex. C, pp. 44, 51, 54, 56, 58, 63, 68 – 84. Plaintiff began refusing to take the Neurontin prescribed for his pain on May 17, 2010. Based on that refusal, Dr. Arnaout discontinued the prescription and provided Plaintiff with Tylenol. *Id*. at pp. 45 – 50, 52, 55, 57, 59 – 62, and 152 – 58.

Defendants state that Plaintiff did not complain about knee pain again until September 29, 2010, when he submitted a sick call slip. Plaintiff was seen on October 23, 2010, when he complained that his knee was painful and swollen, he could not participate in recreational activities, and he experienced instability in the joint. In addition, Plaintiff told P.A. Flury that the elastic knee brace he had been provided was not very helpful. An examination revealed Plaintiff's knee was swollen and exhibited crepitus with movement. P.A. Flury prescribed indomethacin for Plaintiff and made a note to schedule Plaintiff for a steroid injection in his knee. *Id*. at Ex. C, pp. 89 – 94. Plaintiff never received the injection to his knee.

In response to Plaintiff's continued complaints of knee pain he was provided with Naprosyn and Neurontin on November 10, 2010. When he complained the Naprosyn upset his stomach, the Neurontin dosage was increased on December 17, 2010, and a new knee brace with stabilizing straps was ordered. *Id*. at Ex. C, pp. 95 – 98 and 159 – 162. The following February Plaintiff's medications were renewed and it was noted he was wearing his knee brace and walking without assistance. *Id*. at pp. 99 – 105. A referral request for orthopedic consultation

---

[4] Defendants claim Plaintiff received the knee sleeve on April 7, 2010, a fact which is disputed by Plaintiff.

was deferred by Wexford on April 19, 2011, because Plaintiff's knee injury did not adversely affect his daily living activities. Wexford recommended instead that Plaintiff's condition continue to be managed conservatively with a neoprene knee brace and pain management. *Id*. at pp. 121 – 24.

With regard to Plaintiff's complaints of keloids on his face, Defendants assert that keloids are unsightly but are not life-threatening, so the steroid injections are considered cosmetic. *Id*. at Ex. A. Notwithstanding that assessment, Plaintiff was referred for steroid injections when he continued to complain that the keloids were painful and itchy,[5] but there was no one on staff who could administer the injections. Plaintiff was advised to "keep checking back as the situation could change." *Id*. Defendants admit Plaintiff continues to complain about the pain caused by the keloids, but they maintain treatment is purely cosmetic and not medically necessary. *Id*.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

---

[5] Plaintiff was examined by Monica Metheny, R.N., who noted the keloids showed no signs of infection. ECF No. 26 at Ex. A.

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839- 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), *quoting Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

<u>Correctional Defendants</u>

"Section 1983 liability on the part of the supervisory defendants requires a showing that: (1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990)

10

(internal citations omitted); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984) (supervisory liability for an inmate's beating by prison guards). It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir.2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' " *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.2001) *citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984).

Plaintiff asserts that correctional Defendants have "decision making authority and policy changing capabilities given to them by their job description which in itself makes them liable." ECF No. 28 at p. 16. In addition, he claims they should have done more to intervene on his behalf once they were made aware of the fact that he was forced to walk around on an unstable knee. *Id*. The liability Plaintiff seeks to impose is premised on the doctrine of respondeat superior. There is no evidence correctional Defendants tacitly authorized unconstitutional acts by medical providers; rather, it appears from the face of the Complaint that correctional Defendants facilitated appointments for Plaintiff to discuss his concerns with medical staff[6]. Based on the undisputed facts in the record, correctional Defendants are entitled to summary judgment in their favor.

---

[6] Plaintiff complains that the Correctional Defendants did not inquire of medical staff why the recommended surgery found in the MRI report were not followed after other treatments, including assignment to a bottom bunk, were tried without success. ECF No. 28 at p. 6. Plaintiff's assignment to a bottom bunk was not thwarted by correctional staff and there are no allegations that they otherwise refused to accommodate other measures such as the knee brace and physical therapy.

Medical Defendants

With respect to the medical Defendants' treatment of Plaintiff's knee, the undisputed facts establish that Plaintiff's knee is painful and unstable due to a torn ligament (ACL). It is also undisputed that surgery was recommended to address the tear in Plaintiff's knee. Plaintiff asserts that when he was seen by Dr. Espina[7] for steroid injections to his knee, he was asked by Dr. Espina what the problem was with his knee. ECF No. 33 at p. 7. When Plaintiff explained he had a torn ACL, Dr. Espina replied only surgery could fix it. *Id*. Indeed, it does not appear from the record in this case that any of the medical Defendants doubt the validity of the surgical recommendation. Despite the fact that nothing has been done to obtain a second opinion regarding the surgery, it appears to have been disregarded as a possible remedy for Plaintiff's continued complaints of pain. Plaintiff asserts that the current course of conservative treatment is so ineffective that it amounts to no medical care at all. ECF No. 33. Plaintiff states his daily life requires the wearing of a knee brace which does not completely eliminate the sensation of his knee "giving out" on him. *Id*. Although Plaintiff has voiced his frustration with the ineffectiveness of the measures taken and has continuously complained about the pain he experiences, a referral to an orthopedic specialist was deferred because his knee pain did not yet affect his daily activities. There is a genuine dispute of material fact concerning the pain caused by Plaintiff's knee injury and the degree to which Defendants were aware of the pain but took no effective steps to alleviate it.

The medical Defendants' admit their refusal to treat Plaintiff's keloids based on the fact that a condition is not "life threatening." That characterization, however, does not immediately propel the condition out of the realm of possible serious medical needs. This is particularly true of keloids, which Defendants admit are known to grow progressively and which can become

---

[7] Dr. Espina is the doctor to whom inmates were referred for steroid injections. *See* ECF No. 26 at Ex. A.

increasingly painful. Indeed, Plaintiff indicates that the keloids are painful and are growing. ECF No. 33 at p. 5 (describing the keloids as spreading across his face). "Merely because a condition might be characterized as 'cosmetic' does not mean that its seriousness should not be analyzed." *Brock v. Wright*, 315 F. 3d 158, 164, fn. 3 (2nd Cir. 2003). In rejecting the medical care provider's refusal to treat painful keloids because they characterized the conditions as cosmetic, the Second Circuit stated:

> We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one.

*Id*. at 163. There is a distinction to be drawn between a condition that begins as merely cosmetic, but which degenerates into a painful condition. *See e.g. Harris v. Winslow*, 2006 WL 1096011 (N.D. Cal. 2006) (keloids which evolved into itchy, painful, sleep-depriving condition presented triable issue of fact whether it was a serious medical need). This is not to say that a particular treatment such as surgery or steroid injections is constitutionally required. *See e.g., Blayne v. Flattery*, 2005 WL 1630511 (W.D. La. 2005) (no deliberate indifference where doctor repeatedly requested surgery for keloid removal and provided steroid treatments even though eventual surgery required removal of part of prisoner's ear due to growth of keloid); *Pratt v. Solgaard*, 875 F. 2d 870 (9th Cir. 1989) (unpublished) (failure to surgically remove keloids does not state claim where physicians were concerned surgery may worsen condition and other treatment, including cortisone injections, cortisone cream, massage, hot packs, and antibiotic cream were provided).

In the instant case, there appears to be no consideration of serious matters regarding Plaintiff's keloids such as the rate of growth, the pain they are causing, and the success or failure

of past efforts to reduce the keloids. Rather, Defendants have declined responsibility for addressing Plaintiff's complaint unless there is evidence of infection present or the condition becomes life-threatening. ECF No. 26 at Ex. C, p. 97. Although Defendants profess there is no obligation to treat keloids, they also assert that there is no one on staff who can administer steroid injections to Plaintiff's face and that he should keep checking back because the status may change. Medical records submitted by Plaintiff indicate that his keloids have been described as "spreading" and he was referred for steroid injections for the keloids. ECF No. 33 at Ex. 1, pp. 7, 8, 10, 11, and 20. Thus, there is a genuine dispute of material fact regarding whether the conditions of Plaintiff's keloids is an objectively serious medical condition requiring treatment and whether subjectively medical staff knew of the need for treatment but did not act to insure it occurred.

## Conclusion

Correctional Defendants are entitled to summary judgment in their favor. The genuine disputes of material fact present with respect to the claims against medical Defendants requires denial of their Motion to Dismiss or for Summary Judgment. By separate Order which follows, the motion will be denied and Plaintiff's Motion for Appointment of Counsel shall be granted.

Date: __October 14, 2011__    _____/s/_____
DEBORAH K. CHASANOW
United States District Judge